UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ONVI, INC., | ) | |
| | ) | |
| Plaintiff, | ) | 19 C 3201 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| RADIUS PROJECT DEVELOPMENT, INC. and | ) | |
| JABIL, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Onvi, Inc. brings this suit under the diversity jurisdiction against Radius Project Development, Inc. and Jabil, Inc., alleging violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq.*, and common law fraud, fraud in the inducement, fraudulent concealment, promissory estoppel, breach of contract, conversion, and unjust enrichment. Doc. 34. Defendants move under Civil Rule 12(b)(6) to dismiss the ICFA, fraudulent concealment, conversion, unjust enrichment (as to Radius), and promissory estoppel claims. Doc. 35. The motion is granted in part and denied in part.

**Background**

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Onvi's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019-20 (7th Cir. 2013). The

facts are set forth as favorably to Onvi as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

### A. Onvi, Prophix, and Radius

Dr. Craig Kohler is an experienced and successful dentist. Doc. 34 at ¶ 14. After decades in practice, he began inventing dental technology, which he developed and commercialized through Onvi, his corporation. *Id.* at ¶¶ 2, 15. Onvi's featured product was Prophix, a wireless toothbrush that enabled users to take video or photographs of their mouths while brushing their teeth, which they could save or view live using a smartphone. *Id.* at ¶ 16. Kohler wanted to commercialize the product but needed a prototype. *Id.* at ¶ 17. Kohler had no experience in bringing a product to market, so he sought assistance. *Id.* at ¶ 18.

In May 2014, Onvi paid Radius $15,000 for a reliable quote of the time and cost of commercializing Prophix. *Id.* at ¶¶ 21-22. Jabil had acquired Radius in 2013 and was directly involved in its dealings with Onvi. *Id.* at ¶¶ 4-5. Defendants touted themselves as having the experience and expertise necessary to commercialize Prophix. *Id.* at ¶ 19.

Radius's Project Manager, Joe Tokich, told Onvi that Prophix had been selected as one of the two new projects that Radius supports each year. *Id.* at ¶ 23. Onvi emphasized to Tokich and others at Radius the critical importance of commercializing Prophix expeditiously and how, as a new entrant to the design and development space, Onvi needed to rely upon Radius's expertise. *Id.* at ¶¶ 24, 26. Through Tokich, Dave Schwaba, and Dan Hernandez, Radius held itself out as a firm with expertise in commercializing products like Prophix and represented that it could produce a prototype for manufacture within a year. *Id.* at ¶¶ 25, 27. Radius billed itself as a "one-stop shop" that could handle the entire design and development process. *Id.* at ¶ 28.

Schwaba sent Onvi an initial proposal for the first stage of development, which conveyed that Radius could create a prototype of Prophix, a software driven product, even though it specialized in industrial product development. *Id*. at ¶ 29. Knowing that a prototype would require electrical engineering, Tokich and Schwaba represented that Radius would assign experienced electrical engineers to the project. *Id*. at ¶ 30.

In July 2014, Tokich reiterated Radius's purported capabilities. *Id*. at ¶ 32. Tokich told Onvi that, for $1,316,650, Radius could provide the design and engineering services necessary to manufacture and sell Prophix. *Id*. at ¶ 40. Onvi then told Tokich and Hernandez that Prophix required streaming capability with Bluetooth and Wi-Fi enabled devices. *Id*. at ¶ 33. Tokich and Hernandez acknowledged this, and represented that Radius had substantial experience and capabilities relevant to the necessary hardware and software design, enabling it to provide end-to-end services. *Id*. at ¶ 34.

On August 8, 2014, Onvi met with Hernandez, who reiterated that Radius could complete a prototype within one year and had experienced electrical engineers. *Id*. at ¶¶ 35, 41. At some point, Tokich provided a proposal to Onvi that promised deadlines and deliverables culminating in a prototype for commercial launch. *Id*. at ¶ 39.

For several days in late January 2016, Onvi met with Radius at its Hong Kong location, where Tokich claimed that the project was on track. *Id*. at ¶ 62. Tokich suggested that Onvi develop relationships with manufacturers because Prophix was nearing completion. *Ibid*. Shortly thereafter, Tokich met with Kohler at his dental office and again represented that Radius could commercialize Prophix in a timely manner. *Id*. at ¶ 63. On February 26, 2016, Onvi and Tokich toured a manufacturer in Eau Claire, Wisconsin, and Tokich reiterated that Prophix was on track for launch. *Id*. at ¶ 64.

3

As a result of Radius's representations, Onvi proceeded as though Prophix was headed for a timely launch. *Id.* at ¶ 65. With Radius's encouragement, Onvi spent months preparing a launch party. *Id.* at ¶¶ 66-67. At Radius's direction and with the encouragement of its Director of Research, Barbara Ballard, Onvi hired a public relations firm and social media company. *Id.* at ¶¶ 68-69. In March 2016, Onvi developed a public relations strategy, relying upon expectations set by Radius. *Id.* at ¶ 70. Onvi paid a half million dollars to develop commercial and other marketing materials. *Id.* at ¶¶ 72, 129. Onvi met with additional investors and began taking steps to receive preorders for Prophix. *Id.* at ¶ 73.

On March 26, 2016, Tokich visited Onvi's headquarters and explained in detail how Prophix would launch. *Id.* at ¶ 71. Tokich did not disclose any problems with the project. *Ibid.*

On April 26, 2016, a few months before the planned launch, Onvi attended a meeting at Radius's Chicago location. *Id.* at ¶ 75. Tokich, Toriano Granger, Andrew Mouratis, Phil Hague, and Stephen Krotseng, who attended on Radius's behalf, led Onvi to believe that Prophix was on schedule. *Id.* at ¶¶ 76, 78. The only problem they disclosed was that Prophix suffered a "lag time" issue with its video feature. *Id.* at ¶¶ 74, 78. Tokich pretended that it was the first time he had heard of the "lag time" issue. *Id.* at ¶ 79. Radius told Onvi to proceed with its launch party because Prophix was on schedule. *Id.* at ¶ 80. Later, Radius attended the launch party and listened to Kohler praise the company. *Id.* at ¶ 81.

On May 6, 2016, Radius met with Onvi to present its proposal for Prophix packaging. *Id.* at ¶ 82. On May 16, 2016, Tokich told Onvi and outside manufacturers that the product would be ready for the 2016 Christmas season. *Id.* at ¶ 83. In October 2016, Tokich sent Onvi sample manufacturing agreements. *Id.* at ¶ 84. On November 5, 2016, Tokich represented that Prophix's development had progressed sufficiently to plan a December 2016 trip to China to

4

meet with a manufacturer. *Id.* at ¶¶ 85-86. In an email, Mouratis, copying Tokich, told Onvi and the manufacturer that the prototype would be sent to China for the trip. *Id.* at ¶ 86.

In January 2017, John Van Akkeran, Radius's President, met with Onvi in Las Vegas and represented that Prophix was approaching the "finish line" for market entry. *Id.* at ¶ 88. In May 2017, Granger and Mouratis actively discouraged Onvi from having Prophix independently tested by a third-party to gauge its viability. *Id.* at ¶ 89.

Radius's many representations to Onvi between May 2014 and May 2017 were knowingly false. *Id.* at ¶¶ 1, 31-32, 36, 42, 62-64, 71, 77-80, 84, 86, 88. Radius withheld critical information from Onvi, leading it to believe Prophix was on track for commercialization, *id.* at ¶¶ 1, 37-38, 42, 47-49, 59, 61, 64, 71, 77-78, 81-82, 87, 89, and employed "band-aid" solutions so that Onvi would continue to pay Radius, *id.* at ¶ 61.

Despite its representations, Radius could not complete Prophix in-house, but instead had to engage other companies to work on the product's video streaming functionality. *Id.* at ¶ 37. Radius never disclosed to Onvi that it would need to outsource to subcontractors critical components of Prophix's development, nor did it disclose that it would pass on the outsourced costs to Onvi. *Id.* at ¶ 38. Through Tokich, Schwaba, Hernandez, and Van Akkeran, Radius controlled the flow of information regarding Prophix's development and did not inform Onvi of its many failures. *Id.* at ¶¶ 58-59. Radius did not allow Onvi to interface with its subcontractors, delaying the project's development. *Id.* at ¶ 60.

In addition, Radius did not advise Onvi that it did not plan to assign any electrical engineers to the project. *Id.* at ¶¶ 30, 49. At its Chicago location, Radius employed primarily mechanical engineers and industrial designers. *Id.* at ¶ 50. Radius did not assign to the project employees familiar with developing hardware and software solutions. *Ibid.*

5

Radius assigned five different project managers to Prophix over the project's duration. *Id.* at ¶¶ 51-52. Each manager was inexperienced in video-connected devices and electrical engineering. *Id.* at ¶ 53. Each new manager received little, if any, information from his predecessor and required substantial time to get up to speed. *Id.* at ¶ 54. This resulted in delays, a lack of continuity, and deficient communications among the constantly changing project team members. *Id.* at ¶¶ 54-55. Kohler, while running a full-time dental practice and tending to other Prophix-related responsibilities, had to repeatedly re-explain basic features of the product to the project managers. *Id.* at ¶ 57.

**B.      Jabil's Involvement**

Jabil invited Onvi to present at a "Jabil Blue Sky" conference in Fall 2016. *Id.* at ¶ 99. With Jabil's encouragement, Onvi told conference attendees that Jabil had the ability to commercialize products efficiently. *Id.* at ¶¶ 101-102.

On November 16, 2016, Onvi representatives met with Joanne Moretti, Jabil's Chief Marketing Officer. *Id.* at ¶¶ 103-104. Onvi indicated that Prophix was set for manufacture, and Moretti did not disagree. *Ibid.* On January 20, 2017, Christine McDermott, Jabil's Vice President of Marketing, visited Onvi's headquarters with a video crew. *Id.* at ¶¶ 96, 109. The crew interviewed Onvi's co-founder for a story on Jabil's website. *Id.* at ¶ 108. During the meeting, McDermott stated that Prophix was on schedule. *Id.* at ¶ 110.

Based on the conduct and representations of Moretti and McDermott, Onvi continued to fund the project, believing that Prophix was positioned for market entry. *Id.* at ¶ 113. Onvi also relied on statements that Jabil posted to its website describing its involvement with Prophix and trumpeting the product as one of Jabil's success stories. *Id.* at ¶ 114.

In January 2017, Defendants encouraged Onvi to attend a consumer electronics show to promote Prophix. *Id.* at ¶ 117. In advance of the conference, Jabil created a special web page

6

highlighting Prophix. *Id*. at ¶ 118. The prototype provided to Onvi at the show was defective, and Onvi informed Moretti of this fact. *Id*. at ¶¶ 119-120. On a February 8, 2017 phone call with Kohler, Moretti indicated that she had spoken with Radius and assured Onvi that Prophix was on track. *Id*. at ¶ 123.

In a March 2017 email to Onvi, McDermott did not disclose any concerns about Prophix. *Id*. at ¶ 124. Later, as it became apparent that a prototype was not ready and commercialization would not happen on schedule, Onvi reached out directly to Jabil but was ignored. *Id*. at ¶ 125. Jabil's Global Director of New Business Development scheduled a meeting between Onvi and Jabil executives, but the meeting was cancelled. *Ibid*.

Because Jabil worked with Radius on Prophix, it knew of the product's many failures at all relevant times. *Id*. at ¶¶ 91-95, 115. Jabil's representations between Fall 2016 and March 2017 were knowingly false. *Id*. at ¶¶ 1, 13, 19, 91, 97-98, 101, 104-105, 110, 114, 123. Jabil knew of the ongoing development issues with Prophix but intentionally withheld that information from Onvi. *Id*. at ¶¶ 1, 13, 91, 96-98, 101-102, 104, 110, 112, 124. Jabil—in particular, Moretti and McDermott—used Onvi and Prophix as a "success story" to attract new clients even though it knew Prophix was failing. *Id*. at ¶¶ 97-98. Jabil led Onvi to believe that it was committed to Prophix when in fact it was not. *Ibid*.

### C. The Failed Launch

Ultimately, Prophix's launch was postponed, and all preorders were cancelled or delayed indefinitely. *Id*. at ¶ 90. Onvi paid Radius over $2.3 million, yet Radius never provided Onvi with a prototype. *Id*. at ¶¶ 43, 45-46, 130. Defendants never disclosed the full extent of Prophix's failures, forcing Onvi to discover them through its own investigation. *Id*. at ¶ 135. Radius's solution to the failures involved a new six-phase proposal that promised to commercialize the product for an additional $1,777,000 to $2,507,000, plus contingency costs,

7

over another seven to ten months. *Id*. at ¶ 131. Prior to Radius's failed efforts, Onvi was valued at over $15 million, but most of that value has been erased. *Id*. at ¶ 136. As a result of Defendants' conduct, Onvi has suffered long delays and lost value, revenue, profits, time, customers, and business. *Id*. at ¶ 137.

## Discussion

As noted, Defendants seek to dismiss Onvi's ICFA claims, fraudulent concealment claims, promissory estoppel claim, conversion claim, and unjust enrichment claim as to Radius.

### I. ICFA Claims

Onvi alleges that Defendants violated the ICFA. Doc. 34 at ¶¶ 138-50, 181-91. As a threshold requirement to bring an ICFA claim, a plaintiff must either: (1) be a "consumer"; or (2) if a non-consumer, satisfy the "consumer nexus" test. *Tile Unlimited, Inc. v. Blanke Corp.*, 788 F. Supp. 2d 734, 738 (N.D. Ill. 2011). The consumer nexus test is difficult to satisfy, as "Illinois courts are skeptical of business-v.-business ICFA claims when neither party is actually a consumer in the transaction." *Cmty. Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803, 823 (7th Cir. 2018).

Conceding that it is a non-consumer, Onvi proceeds under the consumer nexus test. Doc. 41 at 4-7. To qualify under that test, the plaintiff must allege that it "suffered damages resulting from conduct that is either directed toward the market or otherwise implicates consumer protection concerns." *Tile Unlimited*, 788 F. Supp. at 738 (citing *Athey Prods. Corp. v. Harris Bank Roselle*, 89 F.3d 430, 436-37 (7th Cir. 1996)); *see also First Comics, Inc. v. World Color Press, Inc.*, 884 F.2d 1033, 1039-40 (7th Cir. 1989) ("[Illinois cases] look beyond the effect of the immediate scheme on the putative victim to determine whether a class of consumers was affected. Consequently, consistent with [ICFA], it was incumbent upon First Comics to show that World Color Press' misconduct injured consumers generally.") (internal quotation marks

8

omitted); *Stepan Co. v. Winter Panel Corp.*, 948 F. Supp. 802, 805-06 (N.D. Ill. 1996) ("[W]hen both parties to the suit are commercial entities which are not consumers the test for standing [sic] is whether the alleged conduct invokes trade practices addressed to the market generally or otherwise implicates consumer protection concerns.") (internal quotation marks omitted). Onvi does not qualify under either of the test's alternatives.

As to whether Defendants' conduct was directed toward the market, Onvi points out, Doc. 41 at 5, that the complaint alleges that Defendants made "statements on [their] website[s] that implicate[] consumer protection issues." Doc. 34 at ¶¶ 140, 185. Onvi also cites "specific instances of how Defendants directed their deceptive acts to consumers and the market generally," Doc. 41 at 5, including: (1) that Radius failed to create a functioning prototype, Doc. 34 at ¶ 45, to work properly with subcontractors, *id*. at ¶ 58, or to engage investors, *ibid*.; (2) that Radius encouraged Onvi to plan a launch party and create a public relations and social media strategy, *id*. at ¶ 66-70, 81, to not independently test Prophix with a third party, *id*. at ¶ 89, and to attend a consumer electronics show to highlight Prophix, *id*. at ¶¶ 117-19; and (3) that Radius held up Onvi as a success story for potential clients, *id*. at ¶¶ 133-35.

None of these alleged facts qualify as conduct directed toward the market. Defendants' failure to create a functioning prototype or otherwise commercialize Prophix constitutes conduct directed towards Onvi, not towards consumers generally, as do Defendants' actions encouraging Onvi to host a launch party, adopt a public relations strategy, attend a consumer electronics show, and avoid engaging a third party to test Prophix. *See Harris v. JAT Trucking of Ill., Inc.*, 2009 WL 2222740, at *9 (C.D. Ill. July 24, 2009) (holding that the consumer nexus test was not satisfied where the "allegedly false statements were made to Plaintiff and other employees, not to the general public"). The same holds for Defendants' profiling Onvi on their website or holding

9

it up as a success story to potential business clients. *See Tile Unlimited*, 788 F. Supp. at 740 (holding that no consumer nexus existed where "the complaint allege[d] only that Defendants' false representations about [a product] were directed to [the plaintiff] and other [business entities], not to consumers") (internal quotation marks omitted).

Nor does Onvi allege facts sufficient to show that Defendants' conduct otherwise implicated consumer protection concerns. "To sufficiently establish an implication of consumer protection concerns, [Onvi] must plead … (1) that [its] actions were akin to a consumer's actions to establish a link between [it] and consumers; (2) how [Defendants'] representations … concerned consumers other than [Onvi]; (3) how [Defendants'] particular [actions] involved consumer protection concerns; and (4) how the requested relief would serve the interests of consumers." *Brody v. Finch Univ. of Health Scis./The Chi. Med. Sch.*, 698 N.E.2d 257, 269 (Ill. App. 1998); *see also Sabrina Roppo v. Travelers Commercial Ins. Co.*, 869 F.3d 568, 595 n.79 (7th Cir. 2017) (citing *Brody* as setting forth the "consumer protection concerns" component of the "consumer nexus test") (internal quotation marks omitted). Defendants' alleged failure to commercialize Prophix, or their encouragement of Onvi to make particular decisions, fails to "establish a link between [Onvi] and consumers" and thus does not show that Defendants' "representations … concerned consumers other than [Onvi.]." *Brody*, 698 N.E.2d at 269.

Onvi contends that Defendants' alleged conduct implicates consumer protection concerns because Prophix's many defects, "if kept concealed by Defendants when Prophix was to be brought to market, would drastically affect consumer experience." Doc. 41 at 7. That line of reasoning has been soundly, repeatedly, and correctly rejected:

> The Defendant's argument that the misrepresentation affected consumers
> because consumers ultimately used the product … fails. Almost every
> product sold by one commercial party to another will ultimately be sold to or
> otherwise effect [sic] a consumer. Consequently, if allegations [that the

10

> product ultimately will reach consumers] are sufficient to bring the claim within the ambit of the Act, the Act would apply to nearly all commercial transactions, a result contrary to the intent of the legislature as presently interpreted.

*Stepan*, 948 F. Supp. at 807; *see also Tile Unlimited*, 788 F. Supp. 2d at 740 (same); *Kingsford Fastener, Inc. v. Koki*, 2002 WL 992610, at *3 (N.D. Ill. May 15, 2002) ("[Plaintiff] fails to articulate [a consumer] nexus, … except to state that defendant's conduct not only affected plaintiff, but plaintiff's customers and any other unfortunate purchasers of the defective [product], not to mention the scores of [consumers] who may have been affected by the cost and delay in remedying the problems with the faulty [product].  This amounts to the oft-given and just as often rejected argument that because consumers are ultimately affected, the claim has a consumer nexus.  A consumer nexus is not established, however, simply because consumers are the ultimate users of the products at issue.") (internal quotation marks omitted); *Williams Elec. Games, Inc. v. Barry*, 2001 WL 1104619, at *10 (N.D. Ill. Sept. 18, 2001) (same).

Because Onvi's allegations do not show either that it is a consumer or that it satisfies the consumer nexus test, its ICFA claims are dismissed.

## II. Fraudulent Concealment Claims

Onvi claims that Defendants fraudulently concealed material facts.  Doc. 34 at ¶¶ 162-167, 192-197.  "To plead [its fraudulent concealment claims] properly," Onvi must "meet[] the elements of fraudulent misrepresentation" and also "allege that the defendant intentionally omitted or concealed a material fact that it was under a duty to disclose to [Onvi]."  *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 571 (7th Cir. 2012); *see also Squires-Cannon v. Forest Preserve Dist. of Cook Cnty.*, 897 F.3d 797, 805 (7th Cir. 2018) ("Illinois also recognizes the common-law tort of fraudulent concealment, which requires a plaintiff to allege that the defendant concealed a material fact when he was under a duty to disclose that fact to plaintiff.")

11

(internal quotation marks omitted). "The elements of a claim of fraudulent misrepresentation in Illinois are: (1) a false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from that reliance." *Wigod*, 673 F.3d at 569 (internal quotation marks and alteration omitted).

 Onvi states a viable fraudulent concealment claim. It broadly alleges that "Defendants … misrepresent[ed] the necessary time and cost required to bring [Prophix] to market while concealing their gross mismanagement and failures in developing the product." Doc. 34 at ¶ 1. And Onvi specifically alleges that Radius misrepresented that it had electrical engineers capable of developing Prophix, *id.* at ¶¶ 31-32; 35-36; that Tokich and Hernandez "knew or should have known that Radius was incapable of completing the Prophix project for $1,316,650 … within the promised time frame," *id.* at ¶ 42; that Tokich and others "led [Onvi] to believe that everything was on track for a timely launch" such that Onvi "should … develop[] relationships with … manufacturers," *id.* at ¶ 62; that Tokich reaffirmed during the tour of a Wisconsin manufacturer that "everything was on track with … development," *id.* at ¶ 64; that Tokich "gave a detailed 'explanation' of how Prophix was positioned to enter the market, despite [knowing] Prophix was nowhere near ready," *id.* at ¶ 71; that during a meeting in Chicago, "Radius led [Onvi] to believe that Prophix was on track to reach the commercial market," with Tokich feigning surprise when hearing that the prototype experienced lag time concerns, *id.* at ¶¶ 75-80; that Tokich sent Onvi "sample manufacturing agreements despite [knowing of] serious development issues," *id.* at ¶ 84; that Mouratis claimed that "the working prototype of Prophix would be" ready by December 2016 "despite knowing that it would take months and cost millions of dollars to [actually] complete a working prototype," *id.* at ¶ 86; and that Van Akkeran told Onvi "that

12

Prophix was approaching 'the finish line,'" *id.* at ¶ 88—and that Jabil "invit[ed] Onvi to present as one of its success stories" despite knowing "that the Prophix product was doomed," *id.* at ¶ 101; that Moretti allowed "Onvi to continue to believe that its product was ready for manufacture rather than failing," *id.* at ¶¶ 104-105; that McDermott "communicated that the project was on schedule to reach the market" rather than "reveal any of [its] many ongoing development issues," *id.* at ¶ 110; that Jabil's website "trumpeted Prophix as one of Jabil's success stories," *id.* at ¶ 114; and that Jabil sent a video team to profile Onvi as a Jabil success story, *id.* at ¶¶ 106, 108-109; 112.

Defendants contend that exculpatory provisions in Radius's contracts with Onvi preclude Onvi's ability to rely on Defendants' time and cost estimates. Doc. 36 at 7-9; *see also* Doc. 36-1 at 3-4, 10, 16, 21-22, 26, 45-46 (exculpatory provisions). That contention fails because Onvi also alleges, in a claim Defendants do not move to dismiss, that Radius fraudulently induced it to enter into those contracts and that it would not have contracted with Radius had it known the truth about Radius's capabilities. Doc. 34 at ¶¶ 157-161. Although "[f]raud in the inducement does not [necessarily] negate the fact that the parties actually reached an agreement … whether there was *any* agreement is a distinct question." *Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587, 590 (7th Cir. 2001). And "[o]ne who by misrepresentation has induced another to act to his prejudice cannot relieve himself of liability by a mere disclaimer thereof in advance." *Eisenberg v. Goldstein*, 195 N.E.2d 184, 186 (Ill. 1963).

Defendants next contend that they owed no duty of disclosure to Onvi. Doc. 36 at 6-7. A duty to disclose arises where the "plaintiff and defendant are in a fiduciary or confidential relationship" or the "plaintiff places trust and confidence in [the] defendant, thereby placing [the] defendant in a position of influence and superiority over [the] plaintiff." *Connick v. Suzuki*

13

*Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996). Onvi alleges that "Dr. Kohler, a full-time practicing dentist without any experience in bringing a product to market," Doc. 34 at ¶ 18, sought Defendants' assistance after they "touted themselves as having the experience and expertise necessary to [commercialize] Prophix," *id*. at ¶ 19; that Onvi "advised Radius that, as a new and inexperienced entrant to the design and development world, it needed to rely upon and trust Radius to bring Prophix to market on time and within budget," *id*. at ¶ 26; that Onvi "placed its trust and confidence in Defendants and relied on their experience in the marketplace," *id*. at ¶ 128; and that "Defendants control[] [of] the flow of information" put them "in a position of dominance over Onvi," *ibid*. Onvi further alleges that it repeatedly relied upon Defendants' advice, ultimately "spending more than $2.3 million" at their encouragement. *Id*. at ¶ 130. Drawing reasonable inferences in Onvi's favor, those allegations show a relationship in which Onvi "place[d] trust and confidence in [Defendants], thereby placing [Defendants] in a position of influence and superiority over [Onvi]." *Connick*, 675 N.E.2d at 593. Onvi's fraudulent concealment claims accordingly survive dismissal.

### III. Promissory Estoppel and Unjust Enrichment Claims

Onvi alleges a promissory estoppel claim against Radius, Doc. 34 at ¶¶ 168-171, and an unjust enrichment claim against both Radius and Jabil, *id*. at ¶¶ 203-205. Defendants move to dismiss the former in its entirety and the latter against Radius, contending they are fatally inconsistent with Onvi's claim (which Defendants do not move to dismiss) that it had an express contract with Radius. Doc. 36 at 11-12. That contention fails. As an initial matter, if Onvi prevails on its fraudulent inducement claim, it will have the option to rescind that contract, thus eliminating the premise of Defendants' argument. *See Halla v. Chi. Title & Tr. Co.*, 104 N.E.2d 790, 795 (Ill. 1952) (noting "the familiar rule that a contract induced by fraud is … voidable at the election of the party claiming to have been defrauded"); *Cannon v. Burge*, 752 F.3d 1079,

14

1091 (7th Cir. 2014) (same); *Zaremski v. Am. Arbitration Ass'n, Inc.*, 2012 WL 1623207, at *4 (N.D. Ill. May 9, 2012) ("[F]raudulent inducement renders a contract *voidable*, not void. Illinois law gives two choices to contractual parties claiming fraud in the inducement: (1) rescind the contract, or (2) waive the defect, ratify the contract, and enforce it.") (internal quotation marks and citations omitted). In any event, a plaintiff may state claims in the alternative at the pleading stage. *See* Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.").

Accordingly, Onvi may plead unjust enrichment and promissory estoppel as alternatives to breach of contract. *See Alper v. Altheimer & Gray*, 257 F.3d 680, 687 (7th Cir. 2001) (holding that a plaintiff "is entitled to plead in the alternative, even if the pleadings are inconsistent"); *Lass v. Bank of Am., N.A.*, 695 F.3d 129, 140 (1st Cir. 2012) ("Although the [defendant] is correct that damages for breach of contract and unjust enrichment are mutually exclusive, it is accepted practice to pursue both theories at the pleading stage.") (internal citations omitted); *Hemispherx Biopharma, Inc. v. Mid-South Capital, Inc.*, 690 F.3d 1216, 1227-28 (11th Cir. 2012) (same); *RehabCare Grp., E., Inc. v. Camelot Terrace, Inc.*, 2012 WL 1246560, at *5 (N.D. Ill. Apr. 13, 2012) ("Defendants maintain that the equitable remedies of unjust enrichment and promissory estoppel are not available because there is an adequate remedy of law based on [the plaintiff's] breach of contract claim. Defendants' argument is unavailing because under the federal notice pleading standards, which federal courts apply in all federal civil litigation, a party may plead in the alternative although the pleadings may be inconsistent.") (internal citation omitted). At some point, Onvi's unjust enrichment and promissory estoppel claims may have to yield to the contract claim, or vice versa, but the case is not yet at that point.

15

### IV. Conversion Claim

Onvi's conversion claim alleges that it "has an immediate, unconditional[,] and absolute right to … native 3D CAD files" in Defendants' possession. Doc. 34 at ¶¶ 198-202. Defendants argue the claim is defeated by: (1) the parties' contract, Doc. 36 at 10; (2) the economic loss doctrine, *id*. at 10-11; and (3) Illinois law's prohibition against conversion claims of intangible rights, *id*. at 9-10. The first two arguments are premised on the existence of a contract, *id*. at 10 ("[T]he parties' contract documents bar Onvi's conversion claim."); *id*. at 10-11 ("[T]he economic loss doctrine … bars Onvi's conversion claim. The doctrine prevents parties from 'tortifying' claims that arise from a contractual relationship where damages are purely economic."), and so both are defeated at the pleading stage by Onvi's fraudulent inducement claim for the reasons given in denying dismissal of the promissory estoppel and unjust enrichment claims. As for the third argument, while "Illinois courts do not recognize an action for conversion of intangible rights," *Am. Nat'l Ins. Co. v. Citibank, N.A.*, 543 F.3d 907, 910 (7th Cir. 2008), it cannot be determined in Defendants' favor on the pleadings that the CAD files at issue are intangible.

### Conclusion

Defendants' motion to dismiss is granted in part and denied in part. Onvi's ICFA claims are dismissed, while its fraudulent inducement, conversion, promissory estoppel, and unjust enrichment claims may proceed, as may the claims not subject to Defendants' motion. The dismissal is without prejudice to repleading. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015) ("Ordinarily, … a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend [his] complaint before the entire action is dismissed."). Onvi has until September 1, 2020 to amend its complaint. If Onvi does not amend, the dismissal of its

ICFA claims will convert automatically to a dismissal with prejudice, and Defendants shall answer the surviving portions of the existing complaint by September 15, 2020. If Onvi amends, Defendants shall file their responsive pleading by September 22, 2020.

August 11, 2020                  _____

                                                       United States District Judge