UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ONVI, INC., | ) | |
| | ) | |
| Plaintiff, | ) | 19 C 3201 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| RADIUS PROJECT DEVELOPMENT, INC., and | ) | |
| JABIL, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Onvi, Inc. brings this diversity suit against Radius Project Development, Inc. and Jabil, Inc., alleging common law fraudulent misrepresentation, fraud in the inducement, fraudulent concealment, breach of contract, promissory estoppel, unjust enrichment, and conversion. Doc. 104. (The court dismissed Onvi's statutory fraud claims under Civil Rule 12(b)(6), Docs. 72, 74 (reported at 2020 WL 4607242 (N.D. Ill. Aug. 11, 2020), and Onvi did not attempt to replead them, Doc. 104 at p. 21 n.1.) Radius asserts counterclaims against Onvi for breach of contract and unjust enrichment. Doc. 121 at pp. 23-24.

With discovery closed, Radius and Jabil move for summary judgment on all claims against them, Docs. 113, 116, and Onvi moves for summary judgment on Radius's breach of contract counterclaim, Doc. 110. Onvi's motion is denied; Radius's motion denied as to part of Onvi's contract claim and granted in all other respects; and Jabil's motion is denied as to Onvi's fraudulent concealment claim and granted in all other respects.

## Background

Because the parties cross-move for summary judgment, the court ordinarily would view the disputed facts in the light most favorable to Onvi when considering Defendants' motions and

1

in the light most favorable to Defendants when considering Onvi's motion. *See First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009) ("[B]ecause the district court had cross-motions for summary judgment before it, we construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made.") (internal quotation marks omitted). But because the court will grant in substantial part Defendants' motions and deny Onvi's, the facts are set forth as favorably to Onvi as the record and Local Rule 56.1 permit. *See Garofalo v. Village of Hazel Crest*, 754 F.3d 428, 430 (7th Cir. 2014). At this juncture, the court must assume the truth of those facts, but does not vouch for them. *See Gates v. Bd. of Educ.*, 916 F.3d 631, 633 (7th Cir. 2019).

### A. Onvi

Onvi is a start-up dental technology company founded to develop Prophix, a wireless toothbrush designed to enable users to take and transmit high-quality video and photographs of their teeth. Doc. 134 at ¶ 3; Doc. 131 at ¶ 2; Doc. 127 at ¶ 3. At all relevant times, "Onvi was led by a team of sophisticated, educated and credentialed individuals." Doc. 131 at ¶ 3. Onvi's founder and chief executive officer, Dr. Craig Kohler, is a practicing dentist with a Doctorate of Dental Surgery and an MBA; he had previously run his own dental practice, managed employees, paid taxes, and contracted for sophisticated dental equipment. Doc. 127 at ¶ 4. Onvi's other officers included chief marketing officer Emily Kohler, who had "nearly a decade of experience in marketing strategy, operations, and business management"; chief operating officer and chief financial officer Alex Riemer, who had an advanced degree in engineering management and had worked for companies making high-tech products; and Jamail Carter, Riemer's successor as chief operating officer, who had an MBA and had worked to successfully develop early-stage companies over his entire career. Doc. 131 at ¶¶ 4-6; Doc. 127 at ¶¶ 5-7.

### B.    Onvi's Preliminary Negotiations with Radius

To develop Prophix, Onvi sought the assistance of Radius, a product design and development firm.  Doc. 134 at ¶¶ 4, 8; Doc. 127 at ¶ 1.  At a 2014 meeting with the Kohlers, Radius gave a presentation that included oral representations that Radius could get Prophix to market in "about one year."  Doc 134 at ¶¶ 12-13, 32.  Craig was "very impressed that the proposals would be done in the amount of time that was estimated."  Doc. 112-2 at 22 (83:23-83:25).  Onvi asserts that it relied on this one-year timeline in deciding to contract with Radius.  Doc. 134 at ¶ 33.

Radius further represented "that [Radius] would own the Prophix project in-house except for the use of an outside contractor for website development."  *Id.* at ¶ 14; Doc. 112-3 at 12 (44:15-44:24) (Emily testifying that Radius "said it would own [Prophix development] inhouse, and the only reference to an outside contractor was in regards to the website development").  Additionally, Radius told Onvi that it "had the capabilities of electronic engineers in-house" to work on Prophix.  Doc. 134 at ¶ 16; Doc. 112-2 at 24 (90:17-91:12) (Craig's testimony).  At the time, however, Radius did not employ any electrical engineers in its Chicago office, save a lone intern.  Doc. 134 at ¶¶ 19-20.  Radius employed electrical engineers in other offices.  Doc. 122-5 at 19 (71:1-71:6).

Craig told Radius during the meeting that he had never previously brought a product to market.  Doc. 134 at ¶ 9.  Additionally, according to Onvi, Craig's naïveté regarding product development and commercial transactions meant that he did not know what questions to ask during the parties' negotiations.  Doc. 145 at ¶ 4.  Although Onvi had access to and could have sought legal counsel during the negotiations, as it had retained the law firm Greenberg Traurig in connection with the Prophix project, it did not seek the advice of counsel because Radius's reputation led Craig to believe what Radius told him.  Doc. 131 at ¶ 7; Doc. 145 at ¶ 3.

3

### C.     Onvi's Contract with Radius

Following the 2014 meeting, Onvi entered a contract with Radius for development work on Prophix.  The contract contemplated that Radius would develop a prototype of Prophix. Doc. 117-12 at 4, 14.  The contract comprised a series of ten "proposals," dated from May 29, 2014, through May 25, 2016, setting forth the phases of development work that Radius would complete.  Doc. 131 at ¶¶ 8, 14-15.  Each proposal included these terms:

> **2. What Payment Terms.**  [Radius] will not commence work until [it] receive[s] a prepayment fee equal to 50% of the total amount estimated for each upcoming phase.  Radius will progressively invoice at key project milestones each month.

> **3. Budget & Schedule.**  Unless otherwise specified, [Radius's] budget and schedule and non-binding estimates based upon [Radius's] experience, project complexity, and information provided by [Onvi] at the time of the proposal. Due to the complex nature of new product development, it is often not possible to estimate time and budget with absolute certainty.  New information or requirements, including design inputs, arising during the course of the project and not included in this proposal have the potential to affect the program's costs and scope.  Radius reserves the right to provide revised budget and schedule estimates based on required, necessary, requested, or negotiated changes.

*Id*. at ¶ 10.  Onvi paid only $149,750 of an estimated cost of $436,000, or about 34%, for the prototyping phase.  Doc. 131 at ¶ 15.  Onvi thus failed to satisfy the 50% prepayment requirement for that phase.

As written, the contract did not impose a one-year deadline or other completion date for the development of Prophix.  *Id*. at ¶ 18; Doc. 112-2 at 22 (82:20-83:3) (Craig testifying that the one-year timeline "was not memorialized" in writing).  However, Radius repeatedly made oral and written representations about the product development schedule and deadlines for completion, including representations that Prophix could be developed within one year. Doc. 131 at ¶ 18 ("Radius represented that it could develop the product within a year … and provided written documents reflecting the dates for completion, including an October 8, 2016

[*sic*] showing that Prophix would be ready for manufacturing and delivery by May 10, 2017.");
Doc. 145 at ¶ 5 ("[A] working prototype was verbally promised to be ready by May 2016 … .");
*id*. at ¶ 8 ("Radius provided Onvi with multiple product schedules that included specific
deadlines for completions of phases and for actual development and production of Prophix.").

As written, the contract did not prohibit Radius from using outside contractors.  Doc. 131
at ¶ 20.  Indeed, at least seven of the ten proposals stated Radius's intention to "work with its
electronics development partner."  *Id*. at ¶¶ 21-22.  Craig "assumed" that the term "partner"
referred to Radius employees rather than outside contractors.  Doc. 112-2 at 28 (106:1-107:3).
Although Radius's contractor "was not disclosed by name in the engineering proposals,"
Doc. 145 at ¶ 16, Radius told Onvi in January 2015 that "we may need to partner (sooner and
more intensely than previously envisioned) with one of our electrical engineering development
partners."  Doc. 134 at ¶ 14.  Some four months later, Radius disclosed the contractor's name
and projected fees, as well as Radius's margin on those fees, but Onvi believed that the
contractor was an "ordering house" rather than an engineering firm.  Doc. 131 at ¶¶ 23-24.  Onvi
did not learn until April 2016 that the contractor was, in fact, a contractor.  Doc. 145 at ¶ 21.

In October 2016, Radius submitted to Onvi a final proposal setting forth an estimated
timeline of the remaining work required to complete Prophix and bring it to the commercial
manufacturing stage.  Doc. 131 at ¶ 16.  Onvi did not agree to the proposal, and Radius never
completed the Prophix project.  *Ibid*.  Onvi has an outstanding balance of $110,170 for the work
Radius performed.  *Id*. at ¶ 29.  Onvi acknowledges the outstanding balance, but submits that it
does not owe any money because Radius fraudulently induced it to enter the contract and failed
to perform its contractual obligations.  *Ibid*.

Because of the outstanding balance, Radius did not give Onvi certain native 3D computer-aided design ("CAD") files related to Prophix. *Id*. at ¶ 33. To justify its retention of the files, Radius cites a provision in the contract requiring it to "transfer ownership of any and all intellectual property related to the project" only "[u]pon final payment in full of all fees and expenses due." *Ibid*. Radius, not Jabil, retained the CAD files. Doc. 127 at ¶ 15.

Onvi believes that Radius's work fell below "generally accepted professional product development practices in effect at the time and in the market." Doc. 131 at ¶ 10. The contract provided that, in the event Radius performed below those generally accepted professional practices, Onvi's "sole and exclusive remedy [was] for [Radius] to re-perform such services without additional charge for [Radius's] time expended." *Ibid*. Onvi does not seek to compel Radius to perform any work in accordance with this provision; instead, it contends that the exclusive remedy provision is unenforceable due to Radius's alleged fraud. Doc. 130 at 22-24.

### D. Radius's Relationship with Jabil

Radius's parent company, Jabil, is a separate corporation. Doc. 127 at ¶¶ 1, 2; Doc. 128 at 2. That said, Jabil chief marketing officer Giovanna Moretti, who also served as Radius's general manager beginning in June 2016, Doc. 143 at ¶ 1, testified that Radius and Jabil are "all one company … Radius is a brand name that [Jabil] operates with, but we're all one company." Doc. 129-1 at 13 (44:25-45:2). Moretti qualified her testimony by observing that Radius is "[m]aybe a wholly-owned subsidiary" of Jabil, and that she "can't speak to the legal, who owns what" because she is "not a lawyer." *Id*. at 13 (49:23-49:25). Moretti further testified that Radius provided early product development services that Jabil could not. Doc. 143 at ¶ 4; Doc. 129-1 at 12 (45:4-45:8) ("It's like you build one of something, it's Radius. You need to build a million of something, it's Jabil. Two entirely different skill sets, two different work

streams, two different everything."). Moretti testified that she became Radius's general manager "so that she could get Radius and Jabil to connect more often on opportunities." Doc. 143 at ¶ 4.

After Onvi failed to pay the outstanding balance on its contract with Radius, Mike Susi emailed Moretti, saying that "[w]e have not done work for Onvi for almost a year" because of the non-payment. Doc. 129-1 at 30 (116:3-116:4). Susi worked for Radius, not Jabil, and Moretti testified that Susi's use of "we" referred to Radius. *Id*. at 30 (116:6-116:10); *see also id*. at 21-22 (81:23-82:23) (Moretti testifying that Susi worked only for Radius). In response to Susi's email, Moretti told Susi to "take [Craig's] IP lock stock and barrel." Doc. 143 at ¶ 30.

### E. Onvi's Dealings with Jabil

Onvi had no contract with Jabil. Doc. 127 at ¶¶ 10-12, 19. Jabil's officers nonetheless were aware of the Prophix project, Doc. 143 at ¶¶ 7, 14, including the project's failures, *id*. at ¶¶ 22-23. Despite its knowledge of those failures, Jabil invited Onvi to present at a Jabil conference in 2016 and used Onvi as a reference for prospective customers. *Id*. at ¶¶ 8, 17. In 2017, Jabil contacted Onvi to discuss using Prophix as a "case study," Doc. 127 at ¶ 17, which ultimately was published on both Jabil's and Radius's websites, Doc. 143 at ¶¶ 15-16. Both Onvi and Jabil benefited from the case study marketing. Doc. 127 at ¶ 17. In March 2017, Moretti—who at the time was Jabil's chief marketing officer and Radius's general manager, Doc. 143 at ¶ 1—posted on Twitter about Prophix in a manner that "overstated" the product's status. *Id*. at ¶¶ 26, 27. Moretti worked with another Jabil officer on a marketing campaign for Onvi, and Jabil's website documented work performed for Onvi. *Id*. at ¶ 18.

Jabil took some preliminary steps to attempt to form a business relationship with Onvi. In late 2016, a Radius employee told Onvi that Jabil "want[ed] to partner with Onvi on the online fulfillment side of [its] business." *Id*. at ¶ 12; Doc. 129-4 at ¶ 5. In 2017, Onvi solicited a financial investment from Jabil, but the parties never reached an agreement. Doc. 127 at ¶ 16.

Onvi's solicitation occurred after Radius ceased working on Prophix because of Onvi's non-payment. *Ibid*.

**Discussion**

**I.     Onvi's Fraud Claims**

Onvi asserts common law claims for fraudulent misrepresentation, fraudulent inducement to contract, and fraudulent concealment. Doc. 104 at ¶¶ 156-172, 199-204.

**A.     Fraudulent Misrepresentation and Fraudulent Inducement**

The elements of common law fraudulent misrepresentation are: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591 (Ill. 1996). Fraudulent inducement has the same elements. *See Merrilees v. Merrilees*, 998 N.E.2d 147, 158 (Ill. App. 2013) (explaining that "[f]raudulent inducement is a form of common-law fraud" and has the same elements) (citation omitted). The plaintiff's reliance on the defendant's alleged misrepresentation "must be reasonable." *Pack v. Maslikiewicz*, 144 N.E.3d 37, 65 (Ill. App. 2019). To survive summary judgment, a fraud claim must be supported by "clear and convincing evidence" on each element. *JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co.*, 707 F.3d 853, 864 (7th Cir. 2013).

Onvi's fraudulent representation and fraudulent inducement claims allege that Radius made two sets of false representations: (1) representations that Radius "would be able to design, develop and engineer Prophix in-house, meaning without any outside contractors or vendors"; and (2) representations that Radius "could complete the project in a specified time frame and within a specified budget." Doc. 111 at 7-8.

Onvi cannot ground its fraud claims on the first set of alleged representations because a reasonable jury could not find intent to deceive on Radius's part as to those representations.  *See B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474, 477 (7th Cir. 2005) ("There can be no fraud without a representation made with intent to deceive … .").  Although Radius never "disclosed by name" the contractor it intended to use, Doc. 145 at ¶ 16, it timely disclosed to Onvi—in the contract, no less—that it intended to work with an "electronics development partner."  Doc. 131 at ¶¶ 21-22.  Onvi responds that Craig did not understand "partner" to mean an outside contractor, *ibid.*, citing his deposition testimony that he "just assumed [the partner] was going to be someone within Radius," Doc. 112-2 at 28 (106:23-106:24).

No reasonable jury could find, particularly by clear and convincing evidence, that Radius intentionally misrepresented to Onvi whether it would use an outside contractor for electronics work.  At most, the parties had a misunderstanding about the contractual term "partner," with Craig assuming that it meant an in-house electronic engineer, and Radius intending it to mean an outside contractor.  That falls far short of demonstrating that Radius made an intentional misrepresentation.  *See Reeves v. Davis (In re Davis)*, 638 F.3d 549, 554 (7th Cir. 2011) (holding that the "case involve[d] a miscommunication, not fraud," because the parties merely "had different understandings of what was included in the contract"); *First Mercury Ins. Co. v. Ciolino*, 107 N.E.3d 240, 253 (Ill. App. 2018) ("Simply put, one party's failure to understand a contract term is not equivalent to a fraudulent misrepresentation by the other contracting party."); *Farm Credit Bank of St. Louis v. Isringhausen*, 569 N.E.2d 235, 240 (Ill. App. 1991) (holding that a "self-induced" "misunderstanding" in contract negotiations is not fraudulent inducement); *Aetna Life & Cas. Co. v. Anfinsen Plastic Molding Co.*, 361 N.E.2d 848, 851 (Ill. App. 1977) (distinguishing between a "misrepresentation" and "an honest misunderstanding").  Without

9

evidence demonstrating Radius's intent to deceive, the fraudulent misrepresentation and fraudulent inducement claims necessarily fail as to the first set of representations.

Nor can Onvi ground its fraud claims on the second set of alleged representations—that Radius "could complete the project in a specified time frame and within a specified budget." The exact nature of those representations is unclear because Onvi alleges not "a single act of misrepresentation based on the figures given [by Radius] at the time of the proposal," but rather "that Radius repeatedly changed the scope, cost, and timeline of the project from what was originally promised to Onvi." Doc. 130 at 14. Those representations fall into three sub-categories: (1) before beginning work, Radius represented that it would deliver a working prototype of Prophix in approximately one year; (2) after missing the initial one-year deadline, Radius represented that it would complete Prophix by some future date certain; and (3) throughout the parties' relationship, Radius represented that it would or intended to bring Prophix to market. Doc. 130 at 11. None is actionable as fraud.

As an initial matter, those representations comprise future-oriented opinion statements about expectations or plans, not representations of fact. "A statement which is merely an expression of opinion or which relates to future or contingent events, expectations or probabilities, rather than to pre-existent or present facts, ordinarily does not constitute an actionable misrepresentation under Illinois law." *Cont'l Bank, N.A. v. Meyer*, 10 F.3d 1293, 1298 (7th Cir. 1993) (internal quotation marks omitted); *see also Sinclair v. Sullivan Chevrolet Co.*, 202 N.E.2d 516, 518 (Ill. 1964) ("To be actionable, a false representation must generally relate to an existing or past event, not to a promise or prognostication concerning a future happening … ."). Radius's future-oriented statements about when a working prototype could or

would be completed were "aspirational rather than enforceable—an expression of hope rather than a commitment." *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 866 (7th Cir. 1999).

Pressing the opposite result, Onvi submits that Radius failed to make clear that its representations regarding budget and schedule were statements of mere opinion rather than of fact. In support, Onvi cites *Bommelman v. Transfer Print Foils, Inc.*, 2000 WL 816792 (N.D. Ill. June 22, 2000), for the proposition that a future-oriented statement of opinion can be construed as a statement of fact if "not followed with an expression that th[e] statement was a mere opinion." Doc. 130 at 16. But Onvi's contract with Radius expressly stated that Radius's proposed budgets and schedules were "non-binding estimates based upon [Radius's] experience, project complexity, and information provided by" Onvi. Doc. 131 at ¶ 10. Moreover, the contract explicitly reserved Radius's "right to provide revised budget and schedule estimates based on required, necessary, requested, or negotiated changes." *Ibid*. Given those disclaimers, no reasonable person in Onvi's position could have believed that Radius's representations regarding budget and schedule were anything other than mere estimates—or, as *Bommelman* put it, a non-actionable "opinion of future conduct." *Bommelman*, 2000 WL 816792, at *6.

The same conclusion holds even if Radius's budget and schedule representations concerned its present ability or capacity to complete the project. Such representations, "made in the context of soliciting a customer, can be construed as nothing but an opinion … . If actions for fraud could be successfully maintained every time someone optimistically represents his or her abilities, then our courts would be hopelessly deluged with fraud suits." *Indemnified Cap. Invs., SA. v. R.J. O'Brien & Assocs., Inc.*, 12 F.3d 1406, 1413 (7th Cir. 1993). Indeed, Onvi's own view that Prophix would be "a revolutionary dental product" because no comparable product existed, Doc. 104 at ¶ 16; Doc. 134 at ¶ 23, underscores the difficulty of predicting a

completion date. Because an alleged fraudulent "representation must be a statement of a material fact, rather than a mere promise or opinion," *LaScola v. U.S. Sprint Commc'ns*, 946 F.2d 559, 568 (7th Cir. 1991), Onvi's fraud claim fails with respect to the budget and schedule estimates.

Moreover, even assuming that Radius's budget and schedule estimates were statements of fact rather than opinion, Onvi cannot establish reasonable reliance. "A party is not justified in relying on representations outside of or contrary to the written terms of a contract he or she signs when the signer is aware of the nature of the contract and had a full opportunity to read it." *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 394 (7th Cir. 2003); *see also Cozzi Iron & Metal, Inc. v. U.S. Off. Equip., Inc.*, 250 F.3d 570, 574-75 (7th Cir. 2001) ("As long as the complaining party could have discovered the fraud by reading the contract and had the opportunity to do so, Illinois courts have refused to extend the doctrine of fraudulent inducement to invalidate contracts."); *Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1208 (7th Cir. 1998) ("[Plaintiffs] cannot establish that they reasonably relied on the pre-contract promises when the contractual language was so explicitly to the contrary."). Onvi's officers had an unfettered opportunity to read and understand the contract, Doc. 131 at ¶ 11, which expressly stated that Radius's estimated budget and schedules were non-binding, *id*. at ¶ 10. Accordingly, Onvi could not have reasonably relied on Radius's estimates in agreeing to the contract. *See Avon Hardware Co. v. Ace Hardware Corp.*, 998 N.E.2d 1281, 1288 (Ill. App. 2013) (noting that common law fraud claims fail for lack of reasonable reliance where a written document contains "cautionary language … sufficiently substantive and tailored to the [defendant's] projections, estimates, and opinions").

True enough, the contract stated that Radius's budget and schedule estimates were non-binding "[u]nless otherwise specified." Doc. 131 at ¶ 10. But even if Onvi honestly believed that Radius's budget and schedule representations fell into the "[u]nless otherwise specified" carve-out, the reasonableness of Onvi's reliance on those representations depends on what it "could have learned through the exercise of ordinary prudence." *Turubchuck v. S. Ill. Asphalt Co.*, 958 F.3d 541, 552 (7th Cir. 2020). Persons of ordinary prudence in Onvi's position, when faced with contractual language disclaiming a commitment that they believed that Radius had made, would have sought explicit assurances that Radius's representations regarding budget and schedule were binding. Instead, Craig took no steps to memorialize the budget or timeline in the contract. Doc. 131 at ¶ 18; Doc. 112-2 at 21-22 (81:23-83:3) (Craig's testimony acknowledging that the one-year timeline was never memorialized). Given the sophistication of its corporate officers and its access to legal counsel, Onvi "should have known[] that any terms or promises that were material" to its agreement with Radius "ought to have been included in their contract." *Andy Mohr Truck Ctr., Inc. v. Volvo Trucks N. Am.*, 869 F.3d 598, 610 (7th Cir. 2017) (applying Indiana law, which likewise requires reasonable reliance). Having failed to include those terms or promises in the contract, Onvi cannot now complain of fraud.

## B. Fraudulent Concealment

Onvi also claims that both Radius and Jabil fraudulent concealed material facts regarding the status of and delays encountered during Prophix's development. "[I]n addition to meeting the elements of fraudulent misrepresentation," a fraudulent concealment claim requires demonstrating that the defendant "was under a duty to disclose to the plaintiff." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 571 (7th Cir. 2012). A duty to disclose can arise in two contexts: (1) a special trust relationship arising from a "situation where plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority

over plaintiff," *ibid*.; *see Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 738 (7th Cir. 2017) ("[T]he defendant accused of fraudulent concealment must exercise overwhelming influence over the plaintiff … ."); and (2) where "silence combined with deceptive conduct … results in active concealment" of a material fact, *Greene v. Mizuho Bank, Ltd.*, 206 F. Supp. 3d 1362, 1374-75 (N.D. Ill. 2016) (quoting *Henderson Square Condo. Ass'n v. LAB Townhomes, L.L.C.*, 16 N.E.3d 197, 217 (Ill. App. 2014)). The existence of a duty to disclose must be proved by clear and convincing evidence. *See Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 401 (7th Cir. 2011).

### 1.    Radius

Onvi argues that Radius owed it a duty to disclose under both theories set forth above, Doc. 130 at 17-20, but it cannot succeed under either theory.

As to the first—a situation where the defendant exercises "overwhelming" or "overmastering" influence, making it "clearly dominant" over the plaintiff, *Wigod*, 673 F.3d at 572 (internal quotation marks omitted)—Onvi fails to adduce facts supporting a special trust relationship. "[T]he standard for identifying a special trust relationship is extremely similar to that of a fiduciary relationship." *Squires-Cannon v. Forest Pres. Dist. of Cook Cnty.*, 897 F.3d 797, 806 (7th Cir. 2018). "Accordingly, state and federal courts in Illinois have rarely found a special trust relationship to exist in the absence of a more formal fiduciary one." *Wigod*, 673 F.3d at 571. Onvi does not argue that a Radius owed it any fiduciary obligations, Doc. 130, and in any event no reasonable jury could find that a special trust relationship existed.

Onvi asserts that such a relationship can arise where "one party possesses knowledge not possessed by the other," and submits that a knowledge asymmetry existed here given Onvi's relative inexperience compared to Radius in designing, marketing, and manufacturing products.

Doc. 130 at 19. But "asymmetric information alone does not show the degree of dominance needed to establish a special trust relationship." *Toulon*, 877 F.3d at 738; *see also Redmon v. Whirlpool Corp.*, 2020 WL 9396529, at *7 (N.D. Ill. Apr. 28, 2020) (holding that the defendant's alleged "exclusive knowledge and experience regarding the design and manufacture" of dishwashers did not give rise to a special trust relationship). Onvi's relative inexperience in product development therefore fails to support a special trust relationship as a matter of law.

Even if the information asymmetry alone could demonstrate a special trust relationship, the undisputed facts foreclose any notion that Radius "exercised overwhelming influence" over Onvi. *Wigod*, 673 F.3d at 572 (internal quotation mark omitted). To the contrary, the record indisputably shows that Radius and Onvi engaged in an arm's length transaction in which no duty to disclose could have arisen. *See Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 614 (7th Cir. 2013) (affirming the dismissal of a fraud claim because the complaint "allege[d] no facts or circumstances to support a finding of a duty to disclose" given that "[t]he parties operated at arm's length"); *Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 13-14 (Ill. App. 2001) (holding that an "arms length transaction" between a customer and a car dealer did not trigger a duty to speak); *Mitchell v. Norman James Constr. Co.*, 684 N.E.2d 872, 879 (Ill. App. 1997) ("Although … courts have found that an action [for fraudulent concealment] may lie even in the absence of a fiduciary relationship, the parties in such situations must have engaged in more than a mere arm's length transaction.") (citation omitted); *DreamPak, LLC v. InfoData Corp.*, 2019 WL 130448, at *8 (N.D. Ill. Jan. 8, 2019) (dismissing a fraudulent concealment claim where the parties engaged in a "typical business transaction" at arm's length); *Williams-Ellis v. Mario Tricoci Hair Salons & Spas*, 2007 WL 3232490, at *8 (N.D. Ill. Nov. 1, 2007) ("Illinois courts

have consistently held that arms'-length business transactions … generally do not give rise to a 'special relationship' and concomitant duty to speak.").

Craig's regret that he did not consult with leg]al counsel or ask more questions during the parties' negotiations, Doc. 145 at ¶¶ 3-4, fails to show that their dealings were anything closer than arm's length. Even without outside representation, Onvi was sufficiently sophisticated to negate the prospect that Radius exercised undue influence in the relationship. As the Seventh Circuit has explained, an entity can be "a sophisticated business that has experience entering into contracts" even though it "was not experienced in the subject matter of the agreement and was not represented by counsel." *Cozzi Iron & Metal*, 250 F.3d at 575-76.

Onvi fits that mold. Craig had previously run his own business, managed employees, and entered contracts for sophisticated dental equipment, Doc. 131 at ¶ 3, and Onvi's officers had pertinent academic credentials and substantial professional experience in entrepreneurship, business management, and product development, *id*. at ¶¶ 3-6. Onvi had access to outside legal counsel to assist managing its relationship with Radius, even if it chose not to consult counsel in this instance. *Id*. at ¶ 7. The parties negotiated over the progressive stages of development on Prophix, *id*. at ¶ 8, and Onvi rejected some of Radius's proposals, *id*. at ¶ 12. The record therefore unequivocally shows that Onvi had the sophistication to engage in an ordinary business transaction with Radius, and that any trust Onvi placed in Radius was typical for a business transaction where one party is more knowledgeable. *See Ret. Plan for CTA Emps. v. CTA*, 156 N.E.3d 86, 97-98 (Ill. App. 2020) ("[E]ven if the plaintiffs provided enough evidence to show they trusted the defendant, that was not enough to form a fiduciary relationship. Normal trust between friends or businesses, plus a slightly dominant business position, do not operate to turn a formal, contractual relationship into a confidential or fiduciary relationship.") (internal quotation

marks, citation, and alteration omitted); *DreamPak*, 2019 WL 130448, at *7-8 (holding that the defendant did not exercise overwhelming influence in analogous circumstances). Thus, Radius had no duty to speak by virtue of a special trust relationship with Onvi.

Onvi fares no better under the second theory—where "silence combined with deceptive conduct … results in active concealment" of a material fact, *Greene*, 206 F. Supp. 3d at 1374-75—that can predicate a duty to disclose. Critically, "[m]ere silence in a business transaction does not amount to fraud." *Heider v. Leewards Creative Crafts, Inc.*, 613 N.E.2d 805, 814 (Ill. App. 1993). Instead, only when "silence combined with deceptive conduct or the suppression of material facts results in active concealment" does the defendant have "a duty to speak." *Henderson Square Condo. Ass'n*, 16 N.E.3d at 216.

Onvi suggests that Radius's silence "about delays in the electronic engineering components and that [a contractor] was weeks behind on the development plan" amounted to a concealment of material facts. The case upon which Onvi relies, *Linkepic Inc. v. Vyasil, LLC*, 370 F. Supp. 3d 906 (N.D. Ill. 2019), is inapposite. In that case, the defendant remained silent when faced with a third party's affirmative misstatement that the defendant was a "partner" in the third party's business venture. *Id*. at 917. Given that "deceptive, *affirmative* conduct during a business transaction," the defendant "was then under a duty to correct" the misrepresentation before the plaintiff relied on it. *Ibid*. Here, by contrast, there is no evidence of an analogous affirmative misrepresentation that would have imposed on Radius a duty to correct the record. To the contrary, Onvi complains that "Radius never told Onvi that it was concerned that [the contractor] was 10 weeks behind schedule and that Radius was behind on the delivery" of a component, and that "[n]o one from Radius told Onvi that [the contractor] was having issues

finalizing the camera software for Prophix." Doc. 145 at ¶ 26. That is mere silence, which is insufficient for a fraudulent concealment claim.

In sum, because Radius owed Onvi no duty to disclose, Onvi's fraudulent concealment claim against Radius fails.

### 2. Jabil

By contrast, Onvi's fraudulent concealment claim against Jabil survives summary judgment. Onvi's argument that a special trust relationship existed because Jabil, as a "global powerhouse," possessed "superior knowledge of product development," Doc. 128 at 7-8, fails for the reasons given above. *See Toulon*, 877 F.3d at 738; *Wigod*, 673 F.3d at 573; *Redmon*, 2020 WL 9396529, at *7. But Onvi also contends that Jabil combined its silence with deceptive conduct to create the misimpression that the Prophix project was on track, Doc. 128 at 5-6, 9, and the summary judgment record supports that theory.

A reasonable jury could find that Jabil's actions—inviting Onvi to present at a 2016 conference and using Onvi as a reference for prospective customers, Doc. 143 at ¶¶ 8, 17; highlighting Onvi in a case study and in its social media marketing, *id*. at ¶¶ 15-18, 26-27; and indicating its interest in partnering with Onvi on "the online fulfillment side of [its] business," *id*. at ¶ 12—were deceptive when combined with Jabil's silence about what it knew to be Radius's mishaps and failures. A reasonable jury also could find that Onvi reasonably understood Jabil's actions as conveying that Prophix was on track for completion and commercialization. It follows that a reasonable jury could conclude that Jabil's failure to disclose to Onvi its knowledge of the project's actual status violated its duty to speak. *See Greene*, 206 F. Supp. 3d at 1375 (holding that a bank's silence, combined with its continued acceptance of certain deposits, created a duty to disclose that those deposits could not be withdrawn, reasoning that the bank "actually

suppressed facts that were salient and material for the depositors"). Thus, a triable issue of fact exists as to whether Jabil actively concealed material facts by combining silence with deceptive conduct.

Because much of Jabil's conduct occurred after Onvi failed to sign the last proposal and Radius stopped work on Prophix, it is far from clear that Onvi could have reasonably relied on Jabil's deceptive silence. In seeking summary judgment, however, Jabil advances no arguments about reliance, so the point is forfeited for present purposes. *See Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006) ("As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *Edwards v. Honeywell, Inc.*, 960 F.2d 673, 674 (7th Cir. 1992) ("When a party moves for summary judgment on ground A, his opponent is not required to respond to ground B—a ground the movant might have presented but did not.") (citation omitted). Onvi's fraudulent concealment claim against Jabil will proceed to trial.

## II.     Breach of Contract, Promissory Estoppel, and Unjust Enrichment Claims

Because Onvi's fraud claims against Radius fail as a matter of law, Onvi cannot void its otherwise enforceable contract with Radius. *Cf. 23-25 Bldg. P'ship v. Testa Produce, Inc.*, 886 N.E.2d 1156, 1163 (Ill. App. 2008) ("A contract induced by fraud … is voidable at the election of the party claiming to have been defrauded.").

### A.     Onvi's Contract Claim and Radius's Contract Counterclaim

For their breach of contract claims, Onvi alleges that Radius failed to meet the standard of performance, to timely complete the work agreed upon, and to give Onvi the native 3D CAD files, Doc. 104 at ¶¶ 177-187, while Radius alleges that Onvi failed to pay Radius for services rendered, Doc. 121 at p. 23, ¶¶ 14-19. The claims are inextricably intertwined: Onvi concedes

the outstanding balance under the contract, but argues that its nonpayment is excused by Radius's prior material breaches. *See Elda Arnhold & Byzantio, L.L.C. v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 700 (7th Cir. 2002) (noting the default rule that "a material breach of the terms of the contract will serve to excuse the other party from its duty of counterperformance"). The court thus begins by addressing Radius's alleged breaches.

First, Onvi claims that Radius failed to meet the contractual standard of performance. Doc. 130 at 21-22; Doc. 111 at 10-13. As noted, Radius contractually promised that it would "perform the services in accordance with generally accepted professional product development practices in effect at the time and in the market that the services are performed or to be performed." Doc. 131 at ¶ 10. The record presents a genuine dispute over whether Radius's work met that standard. Doc. 134 at ¶¶ 64-79. The dispute is immaterial, however, because the contract's exclusive remedy clause—which provided that Onvi's "sole and exclusive remedy" for Radius's failure to meet the standard of performance is for Radius "to re-perform such services without additional charge," Doc. 131 at ¶ 10—eliminated any right Onvi had to withhold counterperformance in response. *See* Restatement (Second) of Contracts § 237 cmt. a (noting that the default rules regarding failures of performance, including material breaches, "are, of course, subject to variation by agreement of the parties").

Onvi's only argument against enforcing the exclusive remedy clause is that Radius fraudulent induced it to enter the contract. Doc. 130 at 22-24. But because Onvi's fraud claims against Radius fail as a matter of law, the exclusive remedy clause is valid and enforceable. *See Lobo IV, LLC v. V Land Chi. Canal, LLC*, 138 N.E.3d 824, 850 (Ill. App. 2019) ("Parties may contract for an exclusive remedy under the contract, and once made and agreed upon, this remedy provision is binding on the parties and will be recognized and enforced by our courts.")

(internal quotation marks and alteration omitted); *Hicks v. Airborne Express, Inc.*, 858 N.E.2d 48, 54-55 (Ill. App. 2006) (explaining that an exclusive remedy clause allows contracting parties to allocate risk freely). As a result, Onvi had to pay the outstanding balance even if Radius materially breached through substandard performance.

As this is Onvi's only challenge to Radius's contract counterclaim for full payment, Doc. 111 at 10-13, Onvi's motion for summary judgment on the counterclaim is denied. And Radius's motion for summary judgment on Onvi's contract claim is granted insofar as that claim alleges that Radius breached the contract's standard of performance.

Second, Onvi alleges that Radius breached the contract by failing to timely complete the Prophix project. Doc. 130 at 20-21. As to the contract as written (*i.e.*, the agreed-upon proposals), Onvi's admission that no completion date "was contained in the proposals" fatally undermines this theory. Doc. 131 at ¶ 18. Even putting aside the lack of a completion date in the contract as written, Radius never agreed in writing to finish the development stages of the project. As Emily testified, Onvi never signed the October 2016 proposal that was "required to finish commercialization of the Prophix," so Radius never undertook the obligation to complete the project. *Id*. at ¶ 16. Moreover, Radius had no obligation to complete even the prototyping phase because Onvi failed to make the required prepayment. *Compare id*. at ¶ 15 (Onvi paid only about 34% of the estimated cost for the prototyping phase), *with id*. at ¶ 10 (contract term requiring prepayment of 50% of the estimated costs for each phase). Accordingly, Radius fully performed its obligations under the contract as written.

That said, Onvi has a viable claim that Radius orally modified the contract by promising to complete Prophix within a certain timeframe and then breached by failing to satisfy that promise. Doc. 130 at 11. Although future-oriented statements are not actionable in fraud, they

are in contract, so when "a defendant promised something and then failed to do it," the defendant "breache[d] the contract" even if the "misrepresentation" was not fraudulent. *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 844 (Ill. 2005). Moreover, Illinois law permits oral modification of written contracts. *See U.S. Neurosurgical, Inc. v. City of Chicago*, 572 F.3d 325, 332 (7th Cir. 2009) ("[U]nder Illinois law, the terms of a written contract can be modified by a subsequent oral agreement notwithstanding contractual language to the contrary."). Thus, if Radius orally promised to complete Prophix within a certain timeframe, thereby modifying the contract as written, its failure to complete the project was a breach.

Radius dismisses this theory of breach in a footnote, arguing that Onvi failed to plead an oral modification theory in its complaint. Doc. 144 at 4 n.2. That is true, but irrelevant. On summary judgment, a party may advance new legal theories, as "there is no rule requiring parties to plead legal theories or elements of a case." *Auto Driveaway Franchise Sys., LLC v. Auto Driveaway Richmond, LLC*, 928 F.3d 670, 675 (7th Cir. 2019). "The complaint, in other words, did not dictate the legal theories [Onvi] was permitted to rely on later in the lawsuit." *R3 Composites Corp. v. G&S Sales Corp.*, 960 F.3d 935, 946 (7th Cir. 2020). Onvi's oral modification theory is merely a permissible "alternative legal characterization" of Radius's representations as contractual promises of performance rather than fraudulent misrepresentations. *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 900 F.3d 529, 541 (7th Cir. 2018) (quoting *Whitaker v. Milwaukee Cnty.*, 772 F.3d 802, 809 (7th Cir. 2014)).

Onvi adduces evidence that Radius made a promise to complete Prophix within the timeframe provided in its estimates, thereby orally modifying the contract. Doc. 134 at ¶ 32, 48; Doc. 145 at ¶ 8. Other record evidence supports Radius's contrary view, *ibid.*, but at this stage, the court must construe the record and draw all reasonable inferences in Onvi's favor. *See*

22

*Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). Onvi's breach of contract claim therefore will proceed to trial on the theory that Radius orally promised to complete Prophix by a set deadline and that Radius broke that promise.

Finally, Onvi claims that Radius breached the contract by not turning over the CAD files. Doc. 130 at 24. The contract conditions Radius's obligation to turn over the CAD files on Onvi's "final payment in full of all fees and expenses due." Doc. 131 at ¶ 10. Onvi admits that it had an outstanding balance of $110,170, *id.* at ¶ 29, but whether payment was excused by Radius's failure to timely complete Prophix turns on the oral modification issue. Because that issue must be tried, Radius's summary judgment motion is denied as to this aspect of Onvi's contract claim as well.

### B.     Onvi's Promissory Estoppel and Unjust Enrichment Claims

Given the existence of an enforceable contract, Onvi's promissory estoppel and unjust enrichment claims against Radius fail as a matter of law. "[O]nce it is established, either by an admission of a party or by a judicial finding, that there is in fact an enforceable contract between the parties and therefore consideration exists, then a party may no longer recover under the theory of promissory estoppel." *Prentice v. UDC Advisory Servs., Inc.*, 648 N.E.2d 146, 150 (Ill. App. 1995). The same holds for unjust enrichment. *See Cromeens, Holloman, Sibert*, 349 F.3d at 397. Radius accordingly is entitled to summary judgment on those claims.

Onvi's unjust enrichment claim against Jabil fails to the extent it is premised on Radius's conduct. Without an underlying unjust enrichment claim against Radius, there is no basis for derivative liability against Jabil. In any event, as shown below in discussing Onvi's conversion claims, Jabil cannot be held vicariously liable for Radius's conduct because the evidence does not support piercing the corporate veil between the two companies.

Onvi's unjust enrichment claim against Jabil regarding Jabil's Prophix-related marketing and publicity efforts fails because Onvi suffered no resulting detriment. An unjust enrichment claim requires showing "that the defendant has unjustly retained a benefit to the plaintiff's detriment." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989). But Onvi makes no effort to show that it suffered any such detriment, instead focusing exclusively on the benefits Jabil purportedly reaped from marketing that relied on Prophix's supposed success. Doc. 128 at 12-13. That the defendant reaped a benefit does not necessarily mean that the plaintiff suffered a detriment; an unjust enrichment plaintiff must show both benefit and detriment. *See Cleary v. Philip Morris Inc.*, 656 F.3d 511, 518-20 (7th Cir. 2011) (holding that a company's retention of revenue was not a detriment to certain consumers, even though the money clearly benefitted the company).

In fact, the record establishes that Onvi benefitted from Jabil's marketing efforts, presumably by increasing awareness of Onvi and Prophix. Doc. 127 at ¶ 17 ("Not disputed that the case video provided a benefit to Jabil and Onvi."). Where both sides benefit from the defendant's alleged misconduct, no unjust enrichment claim lies. *See P.H. Int'l Trading Co. v. Christia Confezioni S.p.A.*, 2007 WL 1029359, at *8 (N.D. Ill. Mar. 29, 2007) (granting summary judgment on an unjust enrichment claim where "both parties benefited from any marketing," as "no injustice need be remedied for benefits wrongly conveyed"). Jabil is accordingly entitled to summary judgment on Onvi's unjust enrichment claim.

## III. Onvi's Conversion Claims

Finally, Onvi asserts claims against Defendants for conversion of the 3D CAD files. Doc. 104 at ¶¶ 205-209.

## A.    Radius

The economic loss doctrine provides that "when a contract sets out the duties between the parties, recovery should be limited to contract damages, even though recovery in tort would otherwise be available under the common law." *R.J. O'Brien & Assocs. v. Forman*, 298 F.3d 653, 657 (7th Cir. 2002).  Here, the parties' contract governs their respective duties and rights regarding the transfer of intellectual property, as evidenced by Onvi's own breach of contract claim against Radius for not giving it the CAD files.  Doc. 130 at 24.  Thus, even if Onvi can prove the requisite elements of conversion—including that it "has an absolute and unconditional right to the immediate possession of the property," *Loman v. Freeman*, 890 N.E.2d 446, 461 (Ill. 2008) (citation omitted), despite the contract's requirement that Radius be paid in full before it must hand over the files—Onvi's only possible recovery lies in contract, not tort.

Onvi correctly notes that the economic loss doctrine permits recovery for damages caused by intentional misrepresentation.  Doc. 130 at 25-26; *see Am. United Logistics, Inc. v. Catellus Dev. Corp.*, 319 F.3d 921, 927 n.4 (7th Cir. 2003).  But given the failure of Onvi's fraud claims, that exception does not apply here.

## B.    Jabil

Conversion requires that "the defendant … assumed control, dominion, or ownership over the property."  *Loman*, 890 N.E.2d at 461 (citation omitted).  As noted, only Radius, not Jabil, retained the CAD files.  Doc.  127 at ¶ 15.  Because Jabil does not exercise control, dominion, or ownership over the files, it could not have converted them.  *See Fujifilm N. Am. Corp. v. D/C Exp. & Domestic Packing, Inc.*, 339 F. Supp. 3d 790, 801 (N.D. Ill. 2018) (holding that a conversion claim failed as a matter of law because the defendant "did not assume control, dominion, or ownership" over the plaintiff's property).

Onvi seeks to hold Jabil vicariously liable for Radius's conduct. Because Onvi has no viable conversion claim against Radius, Jabil has no vicarious liability. But even if Radius could be liable for conversion, a conversion claim against Jabil still would fail because "parent corporations are generally not liable for the acts of their subsidiaries." *Forsythe v. Clark USA, Inc.*, 864 N.E.2d 227, 238 (Ill. 2007). Onvi invokes the two exceptions to this rule: first, that a parent is directly liable for its own acts or omissions, *ibid.*; and second, that a parent is liable if "there is a basis for piercing the corporate veil and thus attributing the subsidiaries' torts to the parent," *IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 540 (7th Cir. 1998). Neither exception applies here.

As to the first, Onvi suggests that Jabil directed Radius's allegedly tortious actions. In support, Onvi cites Moretti's command to Susi to take Onvi's intellectual property (presumably the CAD files) "lock stock and barrel." Doc. 128 at 9. That direction, standing alone, is insufficient to demonstrate Jabil's involvement because Moretti held dual roles as an officer of both Jabil and Radius. It is a "well established principle of corporate law that directors and officers holding positions with a parent and subsidiary can and do change hats to represent the two corporations separately," so to prevail on a direct liability theory here, Onvi "must show that the conduct complained of occurred while [Moretti] was acting in [her] capacity as an officer of [Jabil], rather than as an officer of [Radius]." *Forsythe*, 864 N.E.2d at 239 (internal quotation marks and alterations omitted).

Onvi fails to do so. Moretti's undisputed testimony is that her "lock stock and barrel" comment related to Onvi's unfulfilled obligations under the contract between Onvi and Radius. Doc. 129-1 at 32 (123:22-124:5). Moretti further testified that the context of her comment was an update from Susi, a Radius employee, about the state of Onvi's account and Radius's work for

Onvi. *Id*. at 30 (115:21-116:10). Given this backdrop, Jabil is entitled to the "presumption that an act is taken on behalf of the corporation for whom the officer claims to act," particularly because "the act is perfectly consistent with the norms of corporate behavior"—that is, Radius's assertion of its contractual rights. *Gillespie Cmty. Unit Sch. Dist. No. 7 v. Union Pac. R.R. Co.*, 43 N.E.3d 1155, 1183 (Ill. App. 2015) (citations omitted). Without any evidence suggesting that Moretti was acting as a Jabil officer, Onvi does not rebut that presumption and has not met its burden to "do more than simply show that there is some metaphysical doubt" about the capacity in which Moretti acted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014) ("Inferences that rely upon speculation or conjecture are insufficient [to survive summary judgment]."). Onvi therefore cannot prevail on a direct liability theory.

The second exception to the rule against vicarious liability requires "piercing the corporate veil." *IDS Life Ins.*, 136 F.3d at 540. Under Illinois law, "a party bringing a veil-piercing claim bears the burden of showing that the corporation is in fact a dummy or sham for another person or entity." *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008) (internal quotation marks omitted); *see Gass v. Anna Hosp. Corp.*, 911 N.E.2d 1084, 1091 (Ill. App. 2009) ("Piercing a corporate veil is a task which a court undertakes reluctantly since there is a presumption of corporate regularity.") (internal quotation marks and alterations omitted). The relevant considerations include:

> inadequate capitalization; failing to issue stock; failing to observe corporate formalities; failing to pay dividends; corporate insolvency; nonfunctioning corporate officers; missing corporate records; commingling funds; diverting assets to an owner or other entity to creditor detriment; failing to maintain an arm's-length relationship among related entities; and whether the corporation is a mere façade for a dominant owner.

*Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 752 (7th Cir. 2012). Onvi makes no effort to show that it could prevail on most of these factors.

Instead, Onvi relies on Moretti's testimony that Radius and Jabil are "one company," as well as the facts that Jabil owned Radius and that the two companies shared officers. Doc. 128 at 9. That meager showing is insufficient as a matter of law. It is plain that, in context, Moretti's testimony that Jabil and Radius are "one company" simply restated their parent-subsidiary relationship. Doc. 129-1 at 13 (49:25) (Moretti's testimony clarifying that Radius is "[m]aybe a wholly-owned subsidiary" of Jabil). As noted, Moretti expressly disavowed any knowledge of the corporate formalities, *id*. at 13-14 (49:23-49:25, 50:19-22), and Onvi's counsel emphasized that he was "not asking [her] a legal question" about the Jabil-Radius relationship, *id*. at 14 (50:2). Given that context, Moretti's testimony fails to establish anything more than an ordinary relationship between parent and subsidiary, which can include "mutual dealings" and "common officers." *Judson Atkinson Candies*, 529 F.3d at 380-81 (citation omitted). Those undisputed facts "do not come close" to allowing Onvi to pierce the corporate veil. *Id*. at 380.

## Conclusion

Onvi's motion for summary judgment on Radius's counterclaims is denied, Radius's motion for summary judgment is denied as to Onvi's breach of contract claim (insofar as it alleges breach of the timeline for Prophix's completion based on an oral modification to the contract and Radius's failure to turn over the native 3D CAD files) and otherwise is granted, and Jabil's summary judgment motion is denied as to Onvi's fraudulent concealment claim and otherwise is granted. The case will proceed to trial on the surviving claims.

February 23, 2022

_____
United States District Judge